## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF IDAHO

| | |
|---|---|
| **In Re:** <br><br> **All Terrain, LLC** <br><br><div align="right">**Debtor.**</div> | **Bankruptcy Case No. 17-40999-JMM** |

## MEMORANDUM OF DECISION

**Appearances:**

> Thomas D. Smith, Pocatello, Idaho, Attorney for Chapter 7 Trustee.

> Jason R. Naess, Attorney for Gary Rainsdon.

### *Introduction*

Before the Court is the chapter 7[1] trustee's ("Trustee") objection to Claim Number 7. Dkt. No. 294. Gary Rainsdon ("Rainsdon")[2] is the chapter 7 trustee in a separate, but related, case. *See In re Hathaway Homes Group, LLC*, Case No. 17-40992-JMM.

---

[1] Unless otherwise indicated, all chapter references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1532, all Rule references are to the Federal Rules of Bankruptcy Procedure, Rules 1001–9037, and all Civil Rule references are to the Federal Rules of Civil Procedure, Rules 1–88.

[2] This case involves a trustee from a separate bankruptcy case, Gary Rainsdon, asserting a claim in this case on behalf of the other bankruptcy estate. The Court will use Mr. Rainsdon's last name to avoid confusion. No disrespect is intended.

MEMORANDUM OF DECISION − 1

Rainsdon filed Claim Number 7 in this case on behalf of the *In re Hathaway Homes Group, LLC* bankruptcy estate. Trustee in this case objected to that claim. Dkt. No. 294. Rainsdon filed a response to that objection. Dkt. No. 295. Rainsdon and Trustee stipulated to forgo oral argument and submit written briefs only. Dkt. No. 339. The parties stipulated to the admission of Trustee's exhibits 100 through 111 and Rainsdon's exhibits 201 through 223, and filed pre-trial and closing memorandums in support of their positions, Dkt. Nos. 322, 325, 339, 343, 345, and 347–348. The Court has considered the evidence and arguments put forth, and this Memorandum Decision sets forth the Court's findings, conclusions, and reasons for its disposition of the motion. Rules 7052; 9014.

### *Facts*

Between April 2013 and January 2018, Paul Hathaway was the sole owner of Hathaway Homes Group, LLC ("HHG") as well as the Debtor, All Terrain, LLC ("All Terrain"). During this time, HHG advertised, offered for sale, and sold new and used manufactured and modular homes to consumers. All Terrain moved, set up, and completed the interior finishing work on the manufactured and modular homes that HHG sold. All Terrain's primary customer was HHG, which comprised approximately eighty percent of the All Terrain's business. All Terrain provided the labor and materials to complete the homes HHG sold. All Terrain and HHG shared several of the same employees who were paid by both All Terrain and HHG.

Mr. Hathaway moved funds between the All Terrain, HHG, and himself personally. Unfortunately, Mr. Hathaway also had a gambling problem between 2015 and

MEMORANDUM OF DECISION – 2

2017 and used funds from All Terrain and HHG to finance his gambling. In some instances, money was withdrawn out of the All Terrain Wells Fargo bank account at casinos and those funds were used for gambling. Paul Hathaway and his spouse, Mikki Hathaway (collectively, "the Hathaways"), reported gambling winnings and losses on their 2015 and 2016 tax returns of $3.5 million and $3.1 million respectively. Mr. Hathaway only reported the gambling losses up to the amount of the winnings. As a result, the Hathaways, All Terrain, and HHG experienced financial troubles.

The Hathaways, along with All Terrain and HHG, filed separate bankruptcy petitions in November 2017. *In re Paul J. Hathaway and Mikki J. Hathaway*, Case No. 17-40989-JMM ("the Hathaway Case"), *In re All Terrain*, Case No. 17-40999-JMM, and *In re Hathaway Homes Group, LLC*, Case No. 17-40992-JMM ("the HHG Case). Rainsdon filed Claim Number 7 in this case on behalf of the HHG bankruptcy estate asserting a claim to damages for his right to avoid transfers on three bases: 1) avoidable post-petition transfers; 2) avoidable fraudulent transfers within two years prior to commencement of the case; and 3) avoidable fraudulent transfers within four years prior to commencement of the case. Dkt. No. 325. Claim Number 7 includes $145,653.24 in pre-petition transfers and $4,111.36 in post-petition transfers. Trustee, however, does not object to the post-petition transfer amount of Claim Number 7. Only the pre-petition transfer amounts remain in dispute. *Id.* [3]

---

[3] In their pre-trial submissions to the Court, there was a dispute between the parties whether All Terrain and HHG's business records were admissible in order to determine the pre-petition transfer amount. *See*

MEMORANDUM OF DECISION − 3

*Analysis and Disposition*

"Under Rule 3001(f), a filed proof of claim constitutes prima facie evidence of the validity and amount of the claim which, via § 502(a), is deemed allowed unless a party in interest objects." *In re Davis*, 554 B.R. 918, 921 (Bankr. D. Idaho 2016) (citing *Lundell v. Anchor Constr. Specialists, Inc.*, 223 F.3d 1035, 1039 (9th Cir. 2000); *In re Morrow*, 03.2 IBCR 100, 101, 2003 WL 25273857 (Bankr. D. Idaho 2003)). This Court addressed claim objections in *In re Davis*:

> If an objection to a proof of claim is made, the Code instructs the Court to conduct a hearing, to determine the amount of the claim, and to allow the claim, except to the extent that "such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured[.]" § 502(b)(1).
>
> The prima facie validity of the proof of claim afforded to a creditor by Rule 3001(f) does not allocate the burden of proof concerning the validity of the debt; it merely operates as a rebuttable evidentiary presumption in favor of the creditor. In other words, while the Rule satisfies the creditor's "burden of going forward" in support of its claim, *In re Garvida*, 347 B.R. 697, 706 (9th Cir. BAP 2006), the applicable "burden of proof is an essential element of the claim itself [and] one who asserts a claim is entitled to the burden of proof that normally comes with it." *Raleigh v. Illinois Dept. of Revenue*, 530 U.S. 15, 20–21, 120 S. Ct. 1951, 147 L. Ed. 2d 13 (2000).

---

Dkt. No. 322 ("The court should refuse to admit the debtor and HHG's business records into evidence because the circumstances of their preparation indicate a lack of trustworthiness."), and Dkt. No. 325 (The transfers, which are identified in HHG's QuickBooks records, are corroborated by HHG's pre-petition bank account statements, which show the transfers being made to All Terrain."). However, at the hearing on the matter, the parties stipulated to admitting Exhibits 201 through 223. Dkt. No. 339. Exhibit 201 is titled "Hathaway Homes Group QuickBooks Transactions to All Terrain." Dkt. No. 333. Apparently, and somewhat confusingly, the parties use "QuickBooks," "business records," and "records" interchangeably. It appears to the Court that the parties had a pre-hearing dispute as to the admissibility of the HHG's QuickBooks or business records, and then subsequently, at the hearing, agreed to the admission of the business records. Accordingly, the Court will not consider the admissibility of the business records and deems them admitted by stipulation.

MEMORANDUM OF DECISION − 4

*In re Davis*, 554 B.R. 918, 921 (Bankr. D. Idaho 2016).

This Court addressed the burden of persuasion in *In re Gray*:

> The party objecting to the allowance of a claim bears the burden "to
> produce evidence sufficient to negate the prima facie validity of the filed
> claim. If the objector produces evidence sufficient to negate the validity of
> the claim, the ultimate burden of persuasion remains on the claimant to
> demonstrate by preponderance of the evidence that the claim deserves to
> share in the distribution of the debtor's assets."

*In re Gray*, 522 B.R. 619, 625 (Bankr. D. Idaho 2014) (quoting *Spencer v. Pugh (In re Pugh)*, 157 B.R. 898, 901 (9th Cir. BAP 1993) (citing *In re Allegheny Intern., Inc.*, 954 F.2d 167, 173 (3d Cir. 1992)); see also *In re Parrott Broadcasting Ltd. P'ship*, 492 B.R. 35, 38 (Bankr. D. Idaho 2013))).

In this case, the applicable law defining Rainsdon's burden of proof for his claim under § 502(b)(1) is § 548(a)(1)(B) and § 544(b)(1), as well as Idaho Code §§ 55-913 and 55-914. Rainsdon argues that the HHG estate is entitled to recover $145,653.24 transferred from HHG to All Terrain pre-petition because those funds were used by All Terrain for gambling, and HHG did not receive reasonably equivalent value in exchange for those transfers. As noted above, Trustee objects to allowance of Rainsdon's claim because, he argues,  "(1) HHG received reasonably equivalent value in exchange for the transfers and (2) the Debtor may offset any amount in excess of any avoidable transfers." Dkt. No. 345. While Rainsdon's claim enjoys prima facie validity under the Rules, given Trustee's objection, Rainsdon must ultimately prove, by a preponderance of the evidence, that HHG did not receive reasonably equivalent value in exchange for the transfers. *In re Gray*, 522 B.R. at 625.

MEMORANDUM OF DECISION – 5

1.     § 548(a)(1)(B)

In support of his claim, Rainsdon states he can avoid transfers on behalf of the

HHG estate pursuant to § 548(a)(1)(B).[4] This Court addressed the elements of this Code

provision in *In re Miller*:

> There are multiple elements that must be established by a plaintiff to
> sustain a cause of action under § 548(a)(1)(B). There must be a "transfer"
> of property of the debtor that occurs within two years of the filing of the
> bankruptcy petition. The debtor must have received less than "reasonably
> equivalent value in exchange for the transfer" and the transfer had to have
> occurred when the debtor was insolvent or the debtor had to be rendered
> insolvent as a result of the transfer.

*Miller v. Kerstein (In re Miller)*, 536 B.R. 863, 868 (Bankr. D. Idaho 2015) (quoting

*Jordan v. Kroneberger (In re Jordan)*, 392 B.R. 428, 440 (Bankr. D. Idaho 2008)). The

party seeking to avoid the transfer bears the burden of proving all these elements in order

to recover under § 548. *Jordan v. Kroneberger (In re Jordan)*, 392 B.R. at 440. The

Court will address each element.

---

[4] Section 548 provides:

> The trustee may avoid any transfer . . . of an interest of the debtor in property, or any
> obligation . . . incurred by the debtor, that was made or incurred on or within 2 years
> before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
> . . .
> (B)(i) received less than a reasonably equivalent value in exchange for such transfer or
> obligation; and
> (ii)(I) was insolvent on the date that such transfer was made or such obligation was
> incurred, or became insolvent as a result of such transfer or obligation[.]

§ 548.

MEMORANDUM OF DECISION − 6

i.       HHG's Insolvency

The Court will first address HHG's insolvency and the date on which HHG became insolvent. "Insolvency is defined in § 101(32)(A) as a 'financial condition such that the sum of such [debtor]'s debts is greater than all of such [debtor]'s property, at a fair valuation[.]' A 'balance sheet' standard applies in § 548(a) litigation." *Miller v. Kerstein (In re Miller)*, 536 B.R. at 869 (citing *Akers v. Koubourlis (In re Koubourlis)*, 869 F.2d 1319, 1321 (9th Cir. 1989)). In other words, to determine whether HHG was insolvent at the time of the transfers, this Court must determine whether HHG's debts were greater than its assets, at a fair evaluation, exclusive of exempted property. *Akers v. Koubourlis (In re Koubourlis)*, 869 F.2d at 1321.

As of December 31, 2014, HHG had $3,820,422 in assets. Ex. 208. At the same time, HHG had $4,138,306 in liabilities. *Id.* As of December 31, 2015, HHG had $4,707,700 in assets, and $5,556,536 in liabilities. *Id.* As of June 30, 2016, HHG had $5,316,438 in assets, and $6,631,796 in liabilities. Ex. 210. As of the date of the bankruptcy petition filing, HHG had $681,549.51 in assets, and $7,703,141.19 in liabilities. Ex. 211. As far as the Court can tell, Trustee does not dispute that HHG was insolvent on the date of the transfers. On this record, the Court finds that HHG was insolvent as of December 31, 2014, and remained insolvent throughout the entire transfer period until the bankruptcy petition was filed on November 13, 2017.

MEMORANDUM OF DECISION − 7

ii.        Transfer Occurred within Two Years of Filing

A transfer is defined in § 101(54) as each "mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with—(i) property, or (ii) with an interest in property." § 101(54). Here, Rainsdon has the initial burden to demonstrate the transfers that were made within two years of filing are avoidable and recoverable. *Id.*

The bankruptcy petition was filed on November 13, 2017. Thus, for the § 548 analysis, the Court will examine the look-back period between November 12, 2015 and November 13, 2017.[5] The transfers made by HHG to All Terrain during the two years prior to HHG's bankruptcy petition are documented in Exhibit 221. The transfer summaries are corroborated by All Terrain's Wells Fargo account statements in Exhibit 223. As noted above, the parties stipulated to the admission of Exhibits 221 and 223. Dkt. No. 339. "[D]uring the two years prior to HHG's bankruptcy petition, HHG transferred

---

[5] Rule 9006(a)(1) provides:

> When the period is stated in days or a longer unit of time:
>        (A) exclude the day of the event that triggers the period;
>        (B) count every day, including intermediate Saturdays, Sundays, and legal holidays; and;
>        (C) include the last day of the period, but if the last day is a Saturday, Sunday, or legal holiday, the period continues to run until the end of the next day that is not a Saturday, Sunday, or legal holiday.

Rule 9006(a)(1). Here, the petition was filed November 13, 2017. Looking back two years from that date, excluding the day that triggers the period but including the last day, and the leap day in 2016, that places the look-back period between November 12, 2015, and November 13, 2017.

MEMORANDUM OF DECISION − 8

$1,136,554.02 to All Terrain and All Terrain transferred $159,239.26 to HHG, for a net

transfer from HHG of $977,314.76." Dkt No. 343. Of this amount, Rainsdon alleges

$122,289.79 was used by All Terrain for gambling. The transfers in question, as outlined

in the table below, occurred within two years of the bankruptcy petition filing.

    iii.      HHG received less than reasonably equivalent value in exchange for the transfer

This element requires the Court to determine the value received by HHG in

exchange for the interest that was transferred to All Terrain. Thus, Rainsdon must

establish that HHG "'received less than a reasonably equivalent value' in order to satisfy

the requirement of § 548(a)(1)(B)(i)." *Jordan v. Kroneberger (In re Jordan)*, 392 B.R. at

441.

There is a two-step process required to determine whether a debtor received a

reasonably equivalent value. First, it must be determined that the debtor received value,

which, for purposes of section 548 of the Code, is defined as "property, or the satisfaction

or securing of a present or antecedent debt of the debtor[.]" *Id*. (citing *Wyle v. C.H. Rider

& Family (In re United Energy Corp.)*, 944 F.2d 589, 595 (9th Cir. 1991) (quoting

§ 548(d)(2)(A))). "A transfer is for value if one is the quid pro quo of the other." *Id*.

(citing *Pummill v. Greensfelder, Hemker & Gale (In re Richards & Conover Steel, Co.)*,

267 B.R. 602, 612 (8th Cir. BAP 2001)).

HHG transferred a net value of $977,314.76 to All Terrain during the two-year

look back period of § 548(a). Rainsdon asserts that $122,289.79 of this amount was used

to fund All Terrain's gambling. Moreover, the Trustee does not dispute value was given

MEMORANDUM OF DECISION – 9

by HHG to All Terrain. Accordingly, the Court finds that value was transferred from HHG to All Terrain during the two year look back period. The first requirement is met.

The second step is that the Court must determine whether that value was reasonably equivalent to what the debtor gave up. *Jordan v. Kroneberger (In re Jordan)*, 392 B.R. at 441. Determination of "reasonable equivalence" is largely a factual question and latitude is given to the trier of fact. *Id.* (citing *Jacoway v. Anderson (In re Ozark Rest. Equip. Co.)*, 850 F.2d 342, 344 (8th Cir. 1988)). "In order to determine whether a fair economic exchange has occurred, the court must analyze all the circumstances surrounding the transfer in question." *Id.* (citing 5 Collier on Bankruptcy ¶ 548.05.[1][b] at 548–35 (Alan N. Resnick & Henry J. Sommer eds., rev. 15th ed. 2007)). "The determination of reasonable equivalence must be made as of the time of the transfer." *Id.* (citing *BFP v. Resol. Trust Corp.*, 511 U.S. 531, 535, 114 S. Ct. 1757, 128 L. Ed. 2d 556 (1994); *Krommenhoek v. Natural Res. Recovery, Inc. (In re Treasure Valley Opportunities, Inc.)*, 166 B.R. 701, 704 (Bankr. D. Idaho 1994); 5 Collier on Bankruptcy ¶ 548.05.[1][b] at 548–35 (Alan N. Resnick & Henry J. Sommer eds., rev. 15th ed. 2007)). "The concept is not particularly esoteric; a party receives reasonably equivalent value if it gets roughly the value it gave." *Id.* at 441–42 (citing *VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 631 (3rd Cir. 2007); *Lindquist v. JNG Corp (In re Lindell)*, 334 B.R. 249, 255–56 (Bankr. D. Minn. 2005)). "Reasonable equivalence does not require exact equality in value." *Id.* at 442 (citing *Kendall v. Carbaat (In re Carbaat)*, 357 B.R. 553, 560 (Bankr. N.D. Cal. 2006); *see also BFP*, 511 U.S. 531, 540 n. 4, 114 S. Ct. 1757,

MEMORANDUM OF DECISION − 10

128 L. Ed. 2d 556 (1994) ("Our discussion assumes that the phrase 'reasonably equivalent' means 'approximately equivalent,' or 'roughly equivalent.'")).

In the case at bar, as stated above, Mr. Hathaway freely moved funds from HHG to All Terrain and vice versa throughout the look-back period. Rainsdon alleges that $122,289.79 of the funds HHG transferred to HHG were used for gambling by All Terrain, for which HHG did not receive reasonably equivalent value in exchange. In response, Trustee argues that HHG is not entitled to recover the transfers because, "[t[here is no evidence that all of the money Paul Hathaway used for gambling from the Debtor's bank account was HHG's money, or money that was intended to specifically benefit HHG." Dkt. No. 345.

Other bankruptcy courts have held that gambling can constitute a reasonably equivalent exchange of value to the debtor. *See In re Chomakos*, 170 B.R. 585, 593 (Bankr. E.D. Mich. 1993), *subsequently aff'd*, 69 F.3d 769 (6th Cir. 1995) ("Gambling is, arguably, an 'investment' that can have economic value, albeit one that may entail what many view as an unacceptably high risk. The Debtors received the chance to win more money than they wagered. They also received whatever psychic and other intangible values are attendant to being at Flamingo's establishment and gambling."). However, here, HHG transferred funds to All Terrain, and then All Terrain used the funds to gamble, and it is those transfers Rainsdon seeks to avoid. Under *Chomakos*, one could argue that All Terrain itself received a reasonably equivalent exchange in value from the casinos for its gambling in the form of a high risk investment,

MEMORANDUM OF DECISION − 11

the chance to win more money than wagered, and the psychic or other intangible benefits

conferred upon All Terrain. But what of HHG? If, in fact, All Terrain used those funds

for gambling, what did HHG receive in return for it transferring funds to All Terrain that

All Terrain then used for gambling? HHG was not gambling with the funds. HHG did not

receive the chance to win more than wagered, there was no investment with the

possibility of a high return, nor was there any intangible psychic benefit conferred upon

HHG for its transfer to All Terrain. Accordingly, any funds HHG transferred to All

Terrain that were used for gambling, for which HHG received no reasonably equivalent

exchange, can be recovered by Rainsdon on behalf of the HHG estate.

Trustee argues that "[presumably], Paul Hathaway took money from whichever

business had money at the time to fund his gambling problem and to keep both

businesses operating. Nonetheless, the Debtor transferred at least $187,799.26 to HHG

which would have already reimbursed HHG for any of its funds that were used for

gambling." Dkt. No. 345, p. 12.[6] Trustee offers no evidence, beyond this assertion, to

support the argument that the $187,799.26 transferred from All Terrain to HHG was a

reimbursement for the funds used to gamble between April 13, 2015, and

---

[6] Trustee asserts this amount was transferred between April 13, 2015 and November 8, 2017:

> The Debtor and HHG's bank records indicate that between April 13, 2015, and
> November 8, 2017, HHG transferred $1,404,800.36 to the Debtor. During this same time
> the Debtor's bank records indicate the Debtor paid $2,214,691.30 for its expenses, which
> includes $187,799.26 the Debtor transferred directly to HHG when HHG had immediate
> short-term cash needs[.]

*See* Ex. 345, p. 12 (internal citations omitted).

MEMORANDUM OF DECISION – 12

November 8, 2017. Even so, this reasoning is not grounded in the law. "The determination of reasonable equivalence must be made as of the time of the transfer." *Jordan v. Kroneberger (In re Jordan)*, 392 B.R. at 441. The transfers in question were independent transfers that occurred over a period of several years. The Court must analyze the circumstances surrounding each transfer in question.

As noted in the table below, there are numerous transfers from HHG to All Terrain at or near the time that All Terrain used funds for gambling. *See* ex. 223. Any funds that were transferred from HHG to All Terrain to be used for gambling can, assuming the other elements are met, be recovered under § 548(a)(1)(B) because HHG did not receive reasonably equivalent value in return. Thus, the Court must endeavor to determine which transferred funds may have been used for gambling and which may have been used for other purposes.[7] For its analysis, the Court will examine each transfer and the circumstances surrounding that transfer. This includes looking at the cash balance of the All Terrain bank account both before and after the transfers occurred, the transfer amount, any transactions that took place at or near the time of the transfer, and any amounts used for gambling at or near the time of the transfer. The analysis for a single transfer that occurred on a single day is, comparatively speaking, easier than the analysis required where there is a range of dates during which transfers and transactions took

---

[7] *Jordan v. Kroneberger (In re Jordan)*, 392 B.R. at 441. ("The determination of 'reasonable equivalence' is largely a factual question, to which latitude is given the trier of fact. . . . In order to determine whether a fair economic exchange has occurred, the court must analyze all the circumstances surrounding the transfer in question.").

MEMORANDUM OF DECISION − 13

place. The table below provides a summary of those transfers. The Court's findings for

each transfer are described in detail below the table.

| | Date of Transfer from HHG to All Terrain | Amount Transferred from HHG to All Terrain | Date of Gambling Expense by All Terrain | Amount Gambled by All Terrain | Remaining Balance in All Terrain Account | Amount Recoverable by HHG |
|---|---|---|---|---|---|---|
| 1 | 4/11/2016 | $9,350.00 | 4/11/2016 | $7,933.05 | $2,553.38 | ($0.00) |
| 2 | 4/13/2016– 4/25/2016 | $27,100.00 | 4/25/2016 | $9,992.05 | -$1,019.26 | $5,600.00 |
| 3 | 4/26/2016 | $8,240.00 | -- | -- | -- | ($0.00) |
| 4 | 5/27/2016 | $6,200.00 | | | | -- |
| | 5/31/2016 | $4,000.00 | 5/31/2016 | $9,271.40 | $6,674.51 | ($0.00) |
| 5 | 6/10/2016– 6/16/2016 | $14,700 | 6/15/2016 | $5,202.95 | -- | $5,202.95 |
| | -- | -- | 6/16/2016 | $5,170.99 | $331.55 | $4,652.30 |
| 6 | 8/5/2016 | -- | -- | -- | $-12,605.09 | -- |
| | 8/8/2016 | $18,600 | 8/8/2016 | $5,000.00 | $1,693.05 | $5,000.00 |
| 7 | 8/23/2016 | -- | -- | -- | $-14,479.83 | -- |
| | 8/24/2016 | $18,500.00 | 8/29/2016 | $2,000.00 | $-16.34 | $1,125.00 |
| 8 | 9/29/2016– 10/3/2016 | $11,853.00 | 10/3/2016 | $4,702.95 | $85.16 | $4,702.95 |
| 9 | 10/11/2016 | $11,374.00 | 10/11/2016 | $6,300.00 | -- | ($0.00) |
| 10 | 10/17/2016 | $19,153.00 | 10/17/2016 | $20,000.00 | -- | $19,153.00 |
| 11 | 10/18/2016– 10/24/2016 | $18,750.00 | 10/24/2016 | $20,000.00 | -- | $18,750.00 |
| 12 | 11/7/2016 | $9,700.00 | 11/7/2016 | $9,700.00 | -- | ($0.00) |
| 13 | 11/25/2016– 11/30/2016 | $10,605.00 | 11/30/2016 | $5,000.00 | | $5,000.00 |
| 14 | 12/12/2016 | $10,850.00 | 12/12/2016 | $9,950.45 | -- | $9,950.45 |
| 15 | 9/20/2017– 10/10/2017 | $33,131.00 | 10/10/2017 | $4,162.95 | -- | ($0.00) |
| | Total | | | | | $79,136.65 |

MEMORANDUM OF DECISION − 14

1.    Transaction Date: 4/11/2016

On 4/8/2016, the All Terrain end-of-day account balance was $5,915.45. On 4/11/2016, there was a deposit from an unknown source into All Terrain's account for $8,800.00. That same day, HHG transferred $9,350.00 to All Terrain. After these transfers, All Terrain had an account balance of $24,065.45. That same day, on 4/11/2016, All Terrain used $7,933.05 for gambling. On 4/11/2016, there were numerous withdrawals unrelated to gambling, totaling $3,195.05. Based on the record, it is unclear what funds were used by All Terrain for gambling during this time period because of the numerous deposits and transfers. Rainsdon has failed to satisfy his burden that HHG is entitled to any recovery of these funds. *See* Ex. 223, p. 2381.

2.    Transaction Date: 4/13/2016–4/25/2016

There were no other transfers or deposits into All Terrain's account during this time period other than transfers from HHG. There were various expenses and withdrawals made by All Terrain. On 4/12/2016, the All Terrain end-of-day account balance was $2,553.38. HHG transferred $27,100.00 to All Terrain between 4/13/2016 and 4/25/2016. All Terrain transferred $10,109.40 to HHG, amounting to a total net transfer of value of $16,990.60 from HHG to All Terrain. During that same time frame, $8,177.02 was withdrawn for various reasons not including gambling. On 4/21/2016, the All Terrain end-of-day account balance was $5,799.41. There were no other transactions between 4/21/2016 and 4/24/2016. On 4/25/2016, HHG transferred $5,600 to All Terrain, taking the account balance to $11,399.41. That same day, on 4/25/2016, All Terrain spent

MEMORANDUM OF DECISION – 15

$9,992.05 on gambling. Later that same day, three checks were cashed and several other transactions occurred, totaling $2,426.62. On 4/25/2016, the All Terrain end-of-day account balance was overdrawn by $1,019.26. Based on this record, it would be too speculative for this Court to award the full amount to Rainsdon. The previous two transfers, prior to the transfer that occurred on 4/25/2016, from HHG to All Terrain, occurred on 4/13/2016 and 4/21/2016. There were numerous transfers and withdrawals that occurred during this time period. This Court cannot determine whether those funds were used for gambling on 4/25/2016. However, on 4/25/2016, HHG transferred $5,600.00 to All Terrain, and All Terrain spent $9,992.05 on gambling that same day. Accordingly, the Court finds that Rainsdon has satisfied his burden that the funds transferred by HHG to All Terrain on 4/25/2016 were spent on gambling, and that HHG did not receive reasonably equivalent value in exchange. Rainsdon will be entitled to recover $5,600, as noted in the table above. *See* Ex. 223, p. 2427.

   3.  Transaction Date: 4/26/2016

   On 4/25/2016, the All Terrain end-of-day account balance was overdrawn by $1,019.26. After the All Terrain account was assessed an overdraft fee of $35.00 on 4/26/2016, HHG transferred $8,240.00 to All Terrain. That same day, three checks issued by All Terrain were cashed. These checks were issued to Donald Davis, Talon Walker, and Tayson Hathaway, for a total of $3,369.15. Further, there were two more checks issued by All Terrain cashed on 4/27/2016, to Miguel A. Moreno and Greg Miller for a total of $2,663.42. Moreover, that same day All Terrain transferred $2,000.00 to HHG.

MEMORANDUM OF DECISION − 16

Taken together, the transfer and the checks totaled $8,032.57. The funds transferred from HHG to All Terrain prior to 4/25/2016 have already been accounted for above. The transfers from HHG to All Terrain appear to this Court to be accounted for from the withdrawals that occurred on 4/26/2016 and 4/27/2016. Accordingly, the Court finds that Rainsdon has failed to satisfy his burden that HHG is entitled to any recovery of these funds. *See* Ex. 223, p. 2427–60.

4.    Transaction Date: 5/27/2016 and 5/31/2016

Between 5/27/2016 and 5/31/2016, HHG transferred $10,200.00 to All Terrain. During that same time period, a deposit from an unknown source was made to the All Terrain account, as well as a transfer from a personal line of credit, for a total of $10,835.00. In total, there was $5,154.39 in withdrawals or debits for various reasons, not including the gambling expenses. Based on the record, it is unclear what funds were used by All Terrain for gambling during this time period because of the numerous deposits and transfers. Rainsdon has failed to satisfy his burden that HHG is entitled to any recovery of these funds. *See* Ex. 223, p. 2464.

5.    Transaction Date: 6/10/2016–6/16/2016

On 6/10/2016, the All Terrain account was overdrawn by $187.14. Ex. 223, p. 2465. On 6/13/2016, HHG transferred $14,700.00 to All Terrain. Between 6/13/2016 and 6/16/2016, there were nine withdrawals out of the All Terrain account for checks issued by All Terrain, for a total of $3,758.55. The All Terrain account's end-of-day balance on 6/14/2016 was $7,632.78. On 6/15/2016, there was a transfer from Lundyn, LLC that

MEMORANDUM OF DECISION − 17

totaled $3,500.00. After that transfer, the All Terrain account's balance was $11,132.78.

That same day, on 6/15/2016, All Terrain spent $5,202.95 gambling. The following day,

on 6/16/2016, All Terrain spent $5,170.99 gambling. At the end of the day on 6/16/2016,

the All Terrain account had a balance of $331.55. Nearly all of the funds transferred to

the All Terrain account, whether from HHG or Lundyn, LLC, were spent on gambling

during this time period. Here, the Court finds that Rainsdon has satisfied his burden that

the funds transferred by HHG to All Terrain were spent on gambling, and that HHG did

not receive reasonably equivalent value in exchange. Because $518.69 was not spent on

gambling during this time, Rainsdon will not be entitled to recover that amount. Rainsdon

will be entitled to recover $5,202.95 and $4,652.30 ($5,170.99-$518.69), as noted in the

table above. *See* Ex. 223, p. 2506.

6.      Transaction Date: 8/5/2016–8/8/2016

On 8/5/2016, the All Terrain account was overdrawn by $12,640.09 after being

charged an overdraft fee. A deposit from an unknown source was made on 8/6/2016 for

$1,700.00, leaving the account balance overdrawn by $10,940.09. That same day, HHG

transferred $18,600.00 to All Terrain, bringing the account balance up to $7,659.91. After

HHG transferred those funds to All Terrain, and on that same day, All Terrain spent

$5,000.00 gambling, which would have left $2,659.91 in All Terrain's account. There

were also two checks cashed on 8/8/2016 issued by All Terrain, for a total of $966.86,

leaving All Terrain's account balance at $1,693.05. Even though All Terrain's account

was overdrawn by $10,940.09, and the only withdrawals that day amounted to $966.86,

MEMORANDUM OF DECISION − 18

HHG nonetheless transferred $18,600.00 to All Terrain, and of that amount, All Terrain used $5,000.00 for gambling. Here, the Court finds that Rainsdon has satisfied his burden of proving that the funds transferred by HHG to All Terrain were spent on gambling, and that HHG did not receive reasonably equivalent value in exchange. Rainsdon will be entitled to recover $5,000, as noted in the table above. *See* Ex. 223, p. 2550.

7.   Transaction Date: 8/23/2016-8/24/2016

On 8/23/2016, the All Terrain end-of-day account balance was overdrawn by $14,479.83. On 8/24/2016, HHG transferred $18,500 to All Terrain. That same day, there was a check issued by All Terrain and cashed in the amount of $419.50, taking the All Terrain account balance to $3,600.67. On 8/25/2016 there was another deposit from an unknown source into All Terrain's account for $130.05. All Terrain's end-of-day account balance on 8/25/2016 was $3,730.72. On 8/29/2016, there were three withdrawals to the account, totaling $872.06, leaving $2,858.66 in the account. On that same day, All Terrain spent $2,000.00 gambling, and transferred $875.00 back to HHG, leaving All Terrain with a negative balance of $16.34. Here, the Court finds that Rainsdon has satisfied his burden that the funds transferred by HHG to All Terrain were spent on gambling, and that HHG did not receive reasonably equivalent value in exchange. However, on the same day that All Terrain spent $2,000 gambling, All Terrain transferred $875.00 to HHG. Rainsdon has failed to satisfy his burden that HHG did not receive reasonably equivalent value as to that amount, and the amount Rainsdon is

entitled to recover will be offset by $875.00. Rainsdon will be entitled to recover

$1,125.00, as noted in the table above. *See* Ex. 223, p. 2599.

8.      Transaction Date: 9/29/2016–10/3/2016

On 9/28/2016, the All Terrain end-of-day account balance was overdrawn by

$4,862.61. On 9/29/2016, HHG transferred $7,353.00 to All Terrain, and Lundyn, LLC

transferred $245.00 to All Terrain. On 9/29/2016, the All Terrain end-of-day account

balance was $2,665.39. On 9/20/2016, two checks issued by All Terrain were cashed,

totaling $2,367.28. On 9/30/2016, the All Terrain end-of-day account balance was

$298.11. No transactions occurred on 10/1/2016 or 10/2/2016. On 10/3/2016, HHG

transferred $4,500.00 to All Terrain, taking the account balance up to $4,798.11. That

same day, All Terrain spent $4,702.95 gambling. On 10/3/2016, the All Terrain end-of-

day account balance was $85.16. Here, the Court finds that Rainsdon has satisfied his

burden that the funds transferred by HHG to All Terrain were spent on gambling, and that

HHG did not receive reasonably equivalent value in exchange. Rainsdon will be entitled

to recover $4,702.95, as noted in the table above. *See* Ex. 223, p. 2643.

9.      Transaction Date: 10/11/2016

On 10/7/2016, the All Terrain end-of-day account balance was overdrawn by

$149.34, and was assessed an overdraft fee of $35.00, rendering the total overdrawn

amount $184.34. On 10/11/2016, a deposit from an unknown source was made in the

amount of $10,545.00, taking the account balance to $10,360.66. Later that same day,

HHG transferred $11,374.00 to All Terrain. That same day, All Terrain spent $6,300 on

MEMORANDUM OF DECISION − 20

gambling. Based on this record, it is unclear what funds were used for gambling. Prior to the HHG transfers, the All Terrain account had $10,360.66. Thus, because it is unclear to this Court what funds were used for gambling, Rainsdon has failed to satisfy his burden that HHG is entitled to any recovery of these funds. *See* Ex. 223, p. 2643.

          10.    Transaction Date: 10/17/2016

On 10/14/2016, the All Terrain end-of-day account balance was $1,537.03. There were no other transfers in or out of the account until 10/17/2016. On 10/17/2016, there was a deposit from an unknown source for $2,000. There was also a payment from Champion to All Terrain in the amount of $4,800.00. At this time, the All Terrain account balance was $8,337.03. Later the same day, HHG transferred $19,153.00 to All Terrain. Then, All Terrain spent $20,000 on gambling. After those transactions, there were eight withdrawals for checks issued by All Terrain, totaling $5,582.11. However, all eight checks had been issued or dated prior to 10/17/2016, as far back as 8/9/2016. The All Terrain end-of-day account balance was $1,907.16. Because of the dates of the eight issued checks, it is unlikely that the transfer of $19,153.00 from HHG to All Terrain on 10/17/2016 was intended to cover the checks issued earlier but cashed that same day. This Court finds that All Terrain used HHG's funds for gambling. Accordingly, the Court finds that Rainsdon has satisfied his burden that $19,153.00 transferred by HHG to All Terrain were spent on gambling, and that HHG did not receive reasonably equivalent value in exchange. Rainsdon will be entitled to recover $19,153.00, as noted in the table above. *See* Ex. 223, p. 2680.

MEMORANDUM OF DECISION – 21

11.     Transaction Date: 10/18/2016–10/24/2016

As stated above, the All Terrain end-of-day account balance on 10/17/2016 was $1,907.16. On 10/18/2016 and 10/19/2016, there were four transactions for a total withdrawal of $148.56 from the All Terrain account. On 10/18/2016, the All Terrain end-of-day account balance was $1,758.60. On 10/19/2016, HHG transferred $8,500.00 to All Terrain. On 10/19/2016, 10/21/2016 and 10/24/2016, there were three transactions for a total withdrawal of $149.78 from the All Terrain account. The All Terrain end-of-day account balance on 10/21/2016 was $10,143.82. On 10/24/2016, HHG transferred $10,250.00 to All Terrain, and there was one withdrawal transaction for $35.00, leaving $20,358.82. That same day, All Terrain spent $20,000 gambling. On 10/24/2016, the All Terrain end-of-day account balance was $358.82. There were no other transfers or deposits to All Terrain other than those from HHG between 10/17/2016 and 10/24/2016. This Court finds that those funds transferred from HHG to All Terrain were used for gambling. Accordingly, Rainsdon has satisfied his burden that the funds transferred by HHG to All Terrain were spent on gambling, and that HHG did not receive reasonably equivalent value in exchange. Rainsdon will be entitled to recover $18,750.00, as noted in the table above. *See* Ex. 223, p. 2680.

12.     Transaction Date: 11/7/2016

On 11/7/2016, HHG transferred $9,700.00 to All Terrain. That same day, there was a payment made from Champion to All Terrain for $4,800.00, and another deposit from an unknown source for $6,800.00. There were several withdrawals that day as well,

MEMORANDUM OF DECISION − 22

including one to Fleetcor for $2,226.41, and another check for $11,054.00. All Terrain spent $9,750.45 on gambling the same day. It would be an exercise in speculation for this Court to determine where those funds came from that financed All Terrain's gambling. There were numerous deposits from various sources that same day. Thus, because it is unclear to this Court what funds were used for gambling, Rainsdon has failed to satisfy his burden that HHG is entitled to recover any of these funds. *See* Ex. 223, p. 2681.

13.     Transaction Date: 11/25/2016–11/30/2016

On 11/25/2016, the All Terrain end-of-day account balance was overdrawn by $293.05. Between 11/26/2016 and 11/30/2016, HHG transferred $10,605.00 to All Terrain. Also, between 11/26/2016 and 11/30/2016, there were several withdrawals unrelated to gambling, totaling $1,803.31. On 11/30/2016, All Terrain spent $5,000.00 gambling. The All Terrain end-of-day account balance on 11/30/2016 was $3,508.64. There were no other transfers or deposits from any other source to All Terrain during this time. Accordingly, the Court finds that Rainsdon has satisfied his burden that $5,000 of the funds transferred by HHG to All Terrain were spent on gambling, and that HHG did not receive reasonably equivalent value in exchange. Rainsdon will be entitled to recover $5,000.00, as noted in the table above. *See* Ex. 223, p. 2718.

14.     Transaction Date: 12/12/2016

On 12/11/2016, the All Terrain end-of-day account balance was $4,196.62. On 12/12/2016, there was a deposit from Napa for $152.64, taking the account balance to $4,349.26. Later that day, HHG transferred $10,850.00 to All Terrain. That same day,

MEMORANDUM OF DECISION − 23

there were several withdrawals unrelated to gambling and unrelated to the analysis here, totaling $212.50. After those withdrawals, the All Terrain account balance was $15,199.26. Then, $9,950.45 was spent on gambling on the same day. The All Terrain end-of-day account balance on 12/12/2016 was $5,036.31. This Court finds that the HHG funds were used by All Terrain for gambling. HHG transferred $10,850.00 to All Terrain, and then All Terrain spent $9,950.45 on gambling, a difference of $899.55. Although the All Terrain end of day account balance was higher on 12/12/2016 than it was on 12/11/2016, before these transactions and withdrawals, it was only higher by an amount of $687.05. Thus, the Court finds that all of the $9,950.45 spent on gambling came from the funds HHG transferred to All Terrain. Accordingly, the Court finds that Rainsdon has satisfied his burden that the funds transferred by HHG to All Terrain were spent on gambling, and that HHG did not receive reasonably equivalent value in exchange. Rainsdon will be entitled to recover $9,950.45, as noted in the table above. *See* Ex. 223, p. 2719.

15.    Transaction Date: 9/20/2017–10/10/2017

Rainsdon argues that, because HHG transferred $28,338.00 to All Terrain between 9/20/2017 and 10/10/2017, constituting a majority of the funds deposited into the All Terrain account during this time period, and All Terrain spent $4,162.95 on gambling on 10/10/2017, HHG is entitled to recover the funds because it was those funds All Terrain used for gambling. This is far too speculative. There are numerous deposits throughout this time period, some of which were from HHG and some were not. *See* Ex. 223, p.

MEMORANDUM OF DECISION – 24

3067–68. Furthermore, there were also numerous expenses or withdrawals that occurred during this time period. *See* Ex. 221, p. 17. This Court simply cannot determine whether any of the HHG funds transferred to All Terrain were the same funds used by All Terrain for gambling on 10/10/2017. Thus, because it is unclear to this Court what funds were used for gambling, Rainsdon has failed to satisfy his burden that HHG is entitled to any recovery of these funds.

    iv.       Summary

HHG was insolvent as of December 31, 2014, remained insolvent until the bankruptcy petition was filed on November 13, 2017 and thus the transfers in question occurred while HHG was insolvent. Finally, as set forth in the table above, and the analysis related thereto, HHG did not receive reasonably equivalent value in exchange because the funds were used for gambling. HHG transferred a total of $79,136.65 to All Terrain during the two-year look-back period of § 548(a)(1)(B), for which HHG received no reasonably equivalent value in exchange because the funds were used for gambling. Therefore, the Court concludes that $79,136.65 of Rainsdon's claim should be allowed related to the § 548(a)(1)(B) portion of the claim. The balance of the claim made for this two-year period is disallowed.

MEMORANDUM OF DECISION − 25

2.     § 544(b)(1).

Next, Rainsdon asserts a claim arising out of his argument that he can avoid

$23,263.45[8] in transfers on behalf of the HHG estate pursuant to § 544(b)(1). Under §

544(b)(1), a trustee may "avoid any transfer of an interest of the debtor in property . . .

that is voidable under applicable law by a creditor holding an unsecured claim . . . ." *In re

CVAH, Inc.*, 570 B.R. 816, 823 (Bankr. D. Idaho 2017) (quoting § 544(b)(1)). This Court

discussed this Code provision in *In re CVAH*:

> To define the scope of a trustee's § 544(b)(1) avoiding powers, then, it is
> necessary to understand the Code's use of the term "applicable law." In this
> Court's experience, bankruptcy trustees in this District generally rely on
> Idaho's fraudulent transfer laws as the "applicable law" when seeking to
> recover fraudulent transfers avoidable by existing creditors under
> § 544(b)(1). They invoke § 544(b)(1) because the Idaho statutes target
> transfers made within four years of bankruptcy, rather than the two-year
> look-back period provided in § 548(a)(1).

*Id. See also* Idaho Code § 55-918. That is precisely what is occurring here: Rainsdon

invokes § 544(b)(1) to avoid transfers on behalf of the HHG bankruptcy estate pursuant

to Idaho Code §§ 55-913 and 55-914 (collectively the "Idaho avoidable transfer statutes")

for funds transferred from HHG to All Terrain used for gambling, for which HHG did not

receive reasonably equivalent value in exchange, during the four-year look-back period

provided by the Idaho avoidable transfer statutes.

---

[8] These § 544(b) claims that incorporate Idaho's fraudulent transfer avoidance statutes would also include
transfers in the same two-year period prior to the Petition discussed above under § 548. As this Court has
already analyzed these transfers it will not revisit them again in this part of the decision. Thus, the
applicable time frame for these transfers Rainsdon is seeking under § 544(b) is April 1, 2015 to
November 12, 2015 which collectively total $23,263.45.

MEMORANDUM OF DECISION − 26

Rainsdon argues that "The analysis under § 544 and Idaho's fraudulent transfer avoidance statutes is similar to the analysis under § 548, except the duration of the look-back period is four-years instead of the two-years under § 548. . . . Otherwise, the analysis in regards to transfers, reasonably equivalent value, and insolvency is the same." Dkt. No. 343. While this is true, before getting to the Idaho avoidable transfer statutes analysis, the Court must first determine whether an unsecured creditor exists into whose shoes Rainsdon can step to avoid the transfers pursuant to § 544(b).

Section 544(b) provides that a trustee can avoid any transfer that is voidable under applicable law by a creditor holding an allowed unsecured claim. *In re CVAH, Inc.*, 570 B.R. at 825. Thus, there must be a creditor who existed at the time of the transfer. *See Acequia, Inc. v. Clinton (In re Acequia, Inc.)*, 34 F.3d 800, 807 (9th Cir. 1994) ("[T]he existence of a section 544(b) cause of action "depends upon whether . . . a creditor *existing at the time the transfers were made* . . . still had a viable claim against [the] debtor at the time the bankruptcy petition was filed." (emphasis added)); *see also Decker v. Tramiel (In re JTS Corp.)*, 617 F.3d 1102, 1113 (9th Cir. 2010) (holding that "the existence of a § 544(b) claim requires only that *one creditor exist at the time that the transfer was made* and that that creditor have an actionable claim against the estate." (emphasis added)). The trustee steps into its shoes to avoid the transfer under the applicable law. *Id.* (citing *Mukamal v. Kipnis (In re Kipnis)*, 555 B.R. 877, 882 (Bankr. S.D. Fla. 2016; *Ebner v. Kaiser (In re Kaiser)*, 525 B.R. 697, 711 (Bankr. N.D. Ill. 2014)).

MEMORANDUM OF DECISION – 27

The trustee's powers under § 544(b) require pleading and proof of the existence of such an unsecured creditor, as well as a showing that applicable state law grants that creditor the right to avoid the transfer. *Crawforth v. Bachman (In re Bachman)*, No. 05-05596-JDP, 2007 WL 4355620, at *13 (Bankr. D. Idaho Dec. 10, 2007) (citing *Elsaesser v. Raeon (In re Goldberg)*, 99.2 I.B.C.R. 62, 65 (Bankr. D. Idaho 1999)). Simply put, for Rainsdon to avoid transfers pursuant to § 544(b), there must be an unsecured creditor who existed at the time of the transfers which would have the right to seek such avoidance under the applicable state law.

Looking through the parties' pre- and post-hearing memorandums, the Court can find no arguments addressing whether an unsecured creditor existed at the time the transfers occurred. *See* Dkt. Nos. 322, 325, 343, 345, 347, and 348. Recall that § 544(b) requires pleading and proof of the existence of such an unsecured creditor. *Crawforth v. Bachman (In re Bachman)*, No. 05-05596-JDP, 2007 WL 4355620, at *13.

The Court finds the necessary proof to be absent in this case. Rainsdon neither pled nor offered evidence of an unsecured creditor that existed at the time of the transfers in question. Because Rainsdon has not provided the pleading and proof necessary to prove the existence of an unsecured creditor at the time of the transfers, he is unable to invoke § 544(b) to avoid transfers under the Idaho avoidable transfer statutes. Therefore, the Court concludes that the portion of Rainsdon's claim seeking $23,263.45 under § 544(b) is disallowed.

MEMORANDUM OF DECISION − 28

3.    <u>Setoff</u>

Trustee argues that "[t]he Debtor is entitled to setoff any amount it owes to HHG

from any amount HHG owes to the Debtor for services the Debtor provided." Dkt. No.

345, p. 12. In other words, even though there were avoidable transfers recoverable by the

HHG estate, that amount should be reduced by the amount HHG owes All Terrain for

services provided by All Terrain during the same period. Consequently, this invokes

§ 553(a), which this Court previously addressed in *In re Lifestyle Furnishings*:

> Section 553(a) recognizes the "right of any creditor to offset a
> mutual debt owing by such creditor to the debtor that arose before the
> commencement of the case under this title against a claim of such creditor
> against the debtor that arose before the commencement of the case[.]"
>
> Section 553 does not create any new right of setoff, but merely
> acknowledges the existence of the doctrine of setoff under nonbankruptcy
> law, with some limitations. *In re Hipwell*, 97.1 I.B.C.R. 25, 26, 1997 WL
> 34584333, at *2 (Bankr. D. Idaho 1997). "[T]o invoke Section 553, a right
> to setoff must exist under nonbankruptcy law, and the debts sought to be
> offset must be mutual prepetition obligations arising from different
> transactions." *Id.* (citing *Citizens Bank of Maryland v. Strumpf*, 516 U.S.
> 16, 116 S. Ct. 286, 133 L.Ed.2d 258 (1995)). Mutuality is satisfied when
> the "parties have full and concurrent rights against each other." *Hipwell*,
> 97.1 I.B.C.R. at 27, 1997 WL 34584333, at *3. In short, mutuality simply
> requires something be owed by both sides.

*In re Lifestyle Furnishings, LLC*, 418 B.R. 382, 386 (Bankr. D. Idaho 2009).

"One of the defining characteristics of setoff is that 'the mutual debt and claim . . .

are those arising from different transactions.'" *Hipwell*, 97.1 I.B.C.R. at 27, 1997 WL

34584333, at *3 (citing *Newbery Corp. v. Fireman's Fund Ins. Co.*, 95 F.3d 1392, 1398

(9th Cir. 1996). "The right of setoff is permissive; its application is discretionary and in

exercising such discretion the court relies on general principles of equity." *Id.* (citing

MEMORANDUM OF DECISION − 29

*Newbery Corp.*, 95 F.3d at 1399. "The burden of proving an enforceable right of setoff

lies with the party asserting that right." *Id.* (citing *Newbery Corp.*, 95 F.3d at 1399).

The source of All Terrain's putative right to setoff is the contractual arrangement

between HHG and All Terrain. More specifically, Trustee argues that an enforceable

obligation arose between All Terrain and HHG based on an express oral contract, an

implied-in-fact contract, or an implied-at-law contract. Dkt. No. 345, p. 13–14.

The Idaho Supreme Court has recognized these three types of contractual

relationships:

> First is the express contract wherein the parties expressly agree regarding a
> transaction. Secondly, there is the implied in fact contract wherein there is
> no express agreement but the conduct of the parties implies an agreement
> from which an obligation in contract exists. The third category is called an
> implied in law contract, or quasi contract. However, a contract implied in
> law is not a contract at all, but an obligation imposed by law for the purpose
> of bringing about justice and equity without reference to the intent or the
> agreement of the parties and, in some cases, in spite of an agreement
> between the parties. It is a non-contractual obligation that is to be treated
> procedurally as if it were a contract, and is often refered (sic) to as quasi
> contract, unjust enrichment, implied in law contract or restitution.

*Fox v. Mountain W. Elec., Inc.*, 137 Idaho 703, 707–08, 52 P.3d 848, 852–53 (2002)

(quoting *Continental Forest Products, Inc. v. Chandler Supply Co.*, 95 Idaho 739, 743,

518 P.2d 1201, 1205 (1974)).

i.    Express Contract

Under Idaho law, the creation of a contract is generally a question of fact for the

trier of fact to resolve. *Inland Title Co. v. Comstock*, 116 Idaho 701, 702, 779 P.2d 15, 16

(1989). "Formation of a valid contract requires that there be a meeting of the minds to be

MEMORANDUM OF DECISION − 30

evidenced by a manifestation of mutual intent to contract. This manifestation takes the form of an offer and acceptance." *P.O. Ventures, Inc. v. Loucks Family Irrevocable Tr.*, 144 Idaho 233, 237–38, 159 P.3d 870, 874–75 (2007) (quoting *Inland Title Co. v. Comstock*, 116 Idaho at 703, 779 P.2d at 17). "Contract formation requires that the parties have a common and distinct understanding." *McColm-Traska v. Valley View, Inc.*, 138 Idaho 497, 501, 65 P.3d 519, 523 (2003) (citing *Intermountain Forest Mgmt., Inc. v. Louisiana Pac. Corp.*, 136 Idaho 233, 237, 31 P.3d 921, 925 (2001)). "The common and distinct understanding may be express or implied." *Id.* (citing *Fox v. Mountain West Elec., Inc.*, 137 Idaho 703, 707, 52 P.3d 848, 852 (2002)).

Although Trustee asserts that All Terrain is entitled to setoff any mutual debts based on an enforceable obligation that arose by way of an express contract, there is no evidence before the Court to suggest that any of the elements required to form an express contract are present. Trustee discusses this theory very briefly:

> Despite having no written contracts, an enforceable obligation arose between [All Terrain] and HHG based on an express oral contract, an implied in fact contract, or an implied at law contract. The specific terms of an express oral contract may be impossible to determine because Paul Hathaway was the sole owner of both entities. Nonetheless, even if no express contract existed between [All Terrain] and HHG, the facts suggest that an implied in fact contract existed between [All Terrain] and HHG to provide services.

Dkt. No. 345, p. 14–15. Trustee then discusses his other theories in more depth. Trustee carries the burden of proving an enforceable right to setoff. In his post-hearing memorandum, Trustee stated "There were no written agreements between the Debtor and HHG for the work the Debtor provided directly to HHG." Dkt. No. 345. Trustee even

MEMORANDUM OF DECISION – 31

acknowledges that the terms of any contract, if one even existed, would be impossible to determine. The Trustee is asking the Court to speculate about the existence of an express oral or written contract without any evidence being put forth to support the argument. Accordingly, Trustee has not met his burden, and All Terrain is not entitled to setoff HHG's claim on the basis of any express contract between the parties.

ii.     Implied-in-fact contract

The Idaho Supreme Court addressed implied-in-fact contracts in *Fox v. Mountain West. Elec., Inc.*:

> An implied-in-fact contract is defined as one where the terms and existence of the contract are manifested by the conduct of the parties with the request of one party and the performance by the other often being inferred from the circumstances attending the performance. The implied-in-fact contract is grounded in the parties' agreement and tacit understanding. The general rule is that where the conduct of the parties allows the dual inferences that one performed at the other's request and that the requesting party promised payment, then the court may find a contract implied in fact.

*Fox v. Mountain W. Elec., Inc.*, 137 Idaho at 708, 52 P.3d at 853 (internal citations and quotations omitted). "The measure of damages under an implied-in-fact contract is quantum meruit, which 'permits a party to recover the reasonable value of services rendered or material provided on the basis of an implied promise to pay.'" *Clayson v. Zebe*, 153 Idaho 228, 235, 280 P.3d 731, 738 (2012) (quoting *Gray v. Tri–Way Const. Servs., Inc.*, 147 Idaho 378, 387, 210 P.3d 63, 72 (2009)).

"Contracts are often spoken of as express or implied. The distinction involves, however, no difference in legal effect, but lies merely in the mode of manifesting assent."

MEMORANDUM OF DECISION − 32

Restatement (Second) of Contracts § 4, comment a. (1981).[9] One treatise explains the

difference between an express contract and an implied-in-fact contract as such:

> The distinction between an express and an implied-in-fact contract is of
> little importance, if it can be said to exist at all. A contract implied-in-fact
> does not describe a legal relationship different from that created by an
> express contract. Like an express contract, a contract implied-in-fact is a
> genuine agreement between the parties. The only difference is that in an
> express contract the assent or the terms are stated by the parties in words,
> while in an implied contract assent or the terms are implied from the
> conduct of the parties. An implied-in-fact contract requires the same
> elements as an express contract, i.e., mutual assent, offer, acceptance, and
> consideration. In both cases, the contractual duty is imposed by reason of a
> promissory expression. Thus, the legal effect of express and implied-in-fact
> contracts is identical.

42 Jeffrey J. Shampo, C.J.S. IMPLIED CONTRACTS § 11. Simply put, the elements

required to form an express contract are the same elements required to form an implied-

in-fact contract, the only difference, of course, being the way in which the parties

mutually assent. The elements required to form a valid contract under Idaho law were

discussed above,[10] and, just as those elements must be present to form an express

contract, they must also be present to form an implied-in-fact contract.

---

[9] The Restatement (Second) of Contracts provides the following illustration to explain an implied-in-fact
contract: "A telephones to his grocer, 'Send me a ten-pound bag of flour.' The grocer sends it. A has
thereby promised to pay the grocer's current price therefor." Restatement (Second) of Contracts § 4,
comment a. (1981).

[10] Recall, under Idaho law, "Formation of a contract is generally a question of fact for the trier of fact to
resolve." *Inland Title Co. v. Comstock*, 116 Idaho at 702, 779 P.2d at 16. "Formation of a valid contract
requires that there be a meeting of the minds as evidenced by a manifestation of mutual intent to contract.
This manifestation takes the form of an offer and acceptance." *P.O. Ventures, Inc. v. Loucks Family
Irrevocable Tr.*, 144 Idaho at 237–38, 159 P.3d at 874–75 (quoting *Inland Title Co. v. Comstock*, 116
Idaho at 703, 779 P.2d at 17). "Contract formation requires that the parties have a common and distinct
understanding." *McColm-Traska v. Valley View, Inc.*, 138 Idaho at 501, 65 P.3d at 523 (citing
*Intermountain Forest Mgmt., Inc. v. Louisiana Pac. Corp.*, 136 Idaho at 237, 31 P.3d at 925). "The

MEMORANDUM OF DECISION − 33

In support of his implied-in-fact contract claim, Trustee argues:

[E]ven if no express contract existed between the Debtor and HHG, the facts suggest that an implied in fact contract existed between the Debtor and HHG to provide services. For example, the Debtor moved, set up, and completed the interior finishing work on the manufactured and modular homes that HHG sold for several years. HHG was the Debtor's largest customer by far since approximately eighty percent of the Debtor's business was for HHG. It is difficult to imagine that the two entities would have continued such a relationship without either an express or implied agreement that the Debtor would be compensated for the services it provided to HHG.

Dkt. No. 345, p. 14. In order to show that All Terrain is entitled to setoff for any implied-in-fact contract, Trustee must establish that a contract did, in fact, exist. Other than asserting generally that HHG and All Terrain had an ongoing business relationship, Trustee has not established the existence of any of these elements. Furthermore, the elements for a breach of contract claim are "(a) the existence of the contract, (b) the breach of the contract, (c) the breach caused damages, and (d) the amount of those damages." *Mosell Equities, LLC v. Berryhill & Co.*, 154 Idaho 269, 278, 297 P.3d 232, 241 (2013) (citing *O'Dell v. Basabe*, 119 Idaho 796, 813, 810 P.2d 1082, 1099 (1991)). Not only has Trustee failed to establish the existence of a contract, but also Trustee has failed to establish that All Terrain has performed on said contract, such that it would be entitled to performance, or in this instance, setoff, from HHG. Trustee asserts "[i]t is difficult to imagine that the two entities would have continued such a relationship without

common and distinct understanding may be express or implied." *Id.* (citing *Fox v. Mountain West Elec., Inc.*, 137 Idaho at 707, 52 P.3d at 852).

MEMORANDUM OF DECISION − 34

either an express or implied agreement that the Debtor would be compensated for the services it provided to HHG." The record before the Court showing the transfers back and forth between the entities establish that the greater amount was transferred from HHG to All Terrain. There is no evidence that All Terrain has not been compensated for any services it provided to HHG. This is notwithstanding the fact that the evidence failed to establish the existence of any contract. In sum, Trustee has not met his burden, and he is not entitled to setoff HHG's claim for any implied-in-fact contract between the parties.

iii.     Implied-in-law contract

Next, the Court turns to whether All Terrain is entitled to setoff based on the existence of an implied-in-law contract. The Idaho Supreme Court addressed implied-in-law contracts in *Great Plains Equipment, Inc. v. Nw. Pipeline Corp.*:

> [A] contract implied in law is not a contract at all, but an obligation imposed by law for the purpose of bringing about justice and equity without reference to the intent or the agreement of the parties and, in some cases, in spite of an agreement between the parties. It is a non-contractual obligation that is to be treated procedurally *as if* it were a contract, and is often referred to as quasi contract, unjust enrichment, implied in law contract or restitution.

*Great Plains Equip., Inc. v. Nw. Pipeline Corp.*, 132 Idaho 754, 767, 979 P.2d 627, 640 (1999) (quoting *Continental Forest Products, Inc. v. Chandler Supply Co.*, 95 Idaho 739, 518 P.2d 1201 (1974)).

"'Restitution' and 'unjust enrichment' are the modern designations for the older doctrine of 'quasi contracts.' The substance of an action for unjust enrichment lies in a promise, implied by law, that a party will render to the person entitled thereto that which

MEMORANDUM OF DECISION – 35

in equity and good conscience belongs to the latter." *Id.* (quoting *Smith v. Smith*, 95 Idaho 477, 511 P.2d 294 (1973)).

"The two theories, quantum meruit and unjust enrichment, are simply different measures of recovery as equitable remedies. The doctrine of quantum meruit permits recovery, on the basis of an implied promise to pay, of the reasonable value of the services rendered or the materials provided." *Id.* (citing *Peavey v. Pellandini*, 97 Idaho 655, 551 P.2d 610 (1976)). "Unjust enrichment, as a fictional promise or obligation implied by law, allows recovery where the defendant has received a benefit from the plaintiff that would be inequitable for the defendant to retain without compensating the plaintiff for the value of the benefit." *Id.* (citing *Continental Forest Products, Inc. v. Chandler Supply Co.*, 95 Idaho at 743, 518 P.2d at 1205).

"The measure of damages in a claim of unjust enrichment is the value of the benefit bestowed upon the defendant which, in equity, would be unjust to retain without recompense to the plaintiff." *Gillette v. Storm Circle Ranch*, 101 Idaho 663, 666, 619 P.2d 1116, 1119 (1980). "The measure of damages is not necessarily the value of the money, labor and materials provided by the plaintiff to the defendant, but the amount of benefit the defendant received which would be unjust for the defendant to retain." *Id.* (citing *Nielson v. Davis*, 96 Idaho 314, 528 P.2d 196 (1974); *Continental Forest Products, Inc. v. Chandler Supply Co.*, 95 Idaho at 739, 518 P.2d at 1201).

Trustee argues the following in support of the unjust enrichment setoff claim:

[All Terrain] provided essential services to HHG for it to operate its business, and HHG received income based upon these services. Between

MEMORANDUM OF DECISION – 36

> April 13, 2015, and November 8, 2017, [All Terrain] paid approximately
> $2,214,691.30 for its expenses, of which eighty percent, $1,771,753.00,
> *presumably* benefitted HHG, and which includes $187,779.26 transferred
> directly to HHG. This more than offsets the $212,432.46 transferred from
> [All Terrain's] account for gambling and the $1,404,800.36 that HHG
> transferred to [All Terrain] during the same time. As a result, HHG
> received a benefit from the services [All Terrain] provided that would be
> inequitable for HHG to retain without compensating [All Terrain], or more
> precisely its creditors, for the value of the benefit received.

Dkt. No. 345, p. 14 (emphasis added). Trustee estimates that approximately

$1,771,753.00 presumably benefitted HHG because eighty percent of All Terrain's

business was for HHG. In other words, All Terrain performed work for HHG and others,

but eighty percent of All Terrain's business was performed for HHG. Of that estimate,

the evidence suggests that only $187,779.26 was actually transferred to HHG. However,

HHG transferred funds to All Terrain during that time as well, in an amount, according to

Trustee, of $1,404,800.36.

The Idaho Supreme Court address the unjust enrichment doctrine in *Gillette v.*

*Storm Circle Ranch*:

> Unjust enrichment is an equitable doctrine and is inapplicable where the
> plaintiff in an action fails to provide the proof necessary to establish the
> value of the benefit conferred upon the defendant. . . . Although damages
> need not be proven with mathematical precision, the damages, i.e., the
> value of any benefit unjustly received by the defendant in an action based
> upon unjust enrichment, must be proven to a reasonable certainty.

*Gillette v. Storm Circle Ranch*, 101 Idaho at 667, 619 P.2d at 1120.

Trustee has failed to satisfy his burden that All Terrain is entitled to any setoff for

unjust enrichment. Trustee's assertion is merely based on an estimate of how much

money All Terrain spent on its overall expenses pro-rated for the approximate percentage

MEMORANDUM OF DECISION – 37

of All Terrain's total business that involved HHG. Regarding actual transfers and not Trustee's pro-rated estimations, only $187,779.26 was actually transferred from All Terrain to HHG. HHG transferred more than that amount, however, to All Terrain during the same time frame, even excluding those transfers that went on to fund All Terrain's gambling. Trustee has failed to show that All Terrain was not compensated for the work it performed for HHG which, if proven, would it enable it to seek an unjust enrichment claim. Trustee estimates that $1,771,753 of All Terrain's work benefitted HHG, and HHG transferred approximately $1,404,800.36 to All Terrain during this time. As such, Trustee has failed to prove with reasonable certainty the amount, if any, to which HHG is entitled under an implied in law contract theory, and HHG's claim amount will not be reduced based on unjust enrichment.

4.    <u>Recoupment</u>

Next, Trustee argues that HHG's claim against All Terrain should be reduced under the doctrine of recoupment. Dkt. No. 345. Judge Pappas previously addressed this doctrine, observing:

> It is well settled . . . that a bankruptcy defendant can meet a plaintiff-debtor's claim with a counterclaim arising out of the same transaction, at least to the extent that the defendant merely seeks recoupment. Recoupment is an equitable doctrine that involves the netting out of debt arising from a single transaction. It is a judicially developed doctrine that is in the nature of a defense arising out of some feature of the transaction upon which the plaintiff's action is grounded. Stated another way, recoupment is the setting up of a demand arising from the same transaction as the plaintiff's claim or cause of action, strictly for the purpose of abatement or reduction of such claim.

MEMORANDUM OF DECISION – 38

*Rainsdon v. Davisco Foods Int'l, Inc, (In re Azevedo)*, 497 B.R. 590, 595–96 (Bankr. D. Idaho 2013) (internal citations and quotations omitted). Judge Pappas went on to explain the "same transaction" requirement:

> In order to determine whether the "same transaction" requirement of recoupment is satisfied, the Ninth Circuit instructs the bankruptcy court to apply the "logical relationship test." This "logical relationship test" is the same as that used to identify a compulsory counterclaim under Civil Rule 13(a); it asks whether the defendant's claim arises out of "the same aggregate set of operative facts as the [plaintiff's] claim." Under the "logical relationship" test, the word "transaction" is given liberal and flexible construction. A series of transactions may satisfy this flexible standard, but it should not be applied so loosely that multiple occurrences in any continuous commercial relationship would constitute one transaction. In reviewing commercial contracts, it is appropriate to apply the doctrine of recoupment when there are ongoing transactions and obligations arising under the same contract.

*Id.* at 596. "The same transaction requirement of recoupment is primarily what distinguishes it from the doctrine of setoff." *Id.* at fn. 3 (citing § 553; *see also* 5 COLLIER ON BANKRUPTCY ¶ 553.10 (Alan N. Resnick & Henry J. Sommer eds. 16th ed.)).

For recoupment to apply in this case, Trustee must show that All Terrain's dealings with HHG satisfy the requirements of that defense. That is, Trustee must show the parties' agreement: (1) was based on a single transaction between the parties, (2) involved a netting out of debts, and (3) that it is equitable to apply the defense in this case. *Id.* at 598.

First, the Court will address the "single transaction" requirement. Two cases provide apt illustrations of the "single transaction" requirement: *Rainsdon v. Davisco Foods Int'l, Inc, (In re Azevedo)*, 497 B.R. 590 (Bankr. D. Idaho 2013); and *California*

MEMORANDUM OF DECISION − 39

*Canners and Growers v. Military Distribs. of Virginia (In re California Canners and Growers)*, 62 B.R. 18, 20 (9th Cir. BAP 1986).

    *In re Azevedo* provides an example of a situation where the Idaho Bankruptcy Court found that a single agreement between the parties could govern a series of transactions or occurrences between the parties for the purposes of recoupment. As a cheese producer, the defendant purchased and received more than ninety truckloads of raw milk daily from dairy farmers. 497 B.R. at 593. Azevedo was a dairy farmer who sold his milk to defendant. *Id.* In the dairy industry, it is common for a commercial purchaser to pay the dairy farmer the month after the milk is delivered. *Id.* Sometimes, however, the parties work out an arrangement where the purchaser will give the farmer a cash advance for the milk. *Id.* This type of arrangement was present in *Azevedo*:

> [Azevedo] was a long-time Davisco milk supplier. Azevedo sold milk to Davisco in December 2010. Needing funds to operate, that same month, Azevedo asked Davisco for an advance for the milk he had delivered. At the time of the delivery, Davisco owed Azevedo $132,847.88 for milk, which amount, under normal circumstances, would be paid to Azevedo in January 2011. Of that amount, Azevedo asked Davisco for an advance of $100,000.
>
> Davisco complied with Azevedo's request. The parties agreed that, instead of netting out the $100,000 advance from the payments to be made by Davisco to Azevedo in January, Davisco would deduct a fixed sum from each future payment it owed to Azevedo for future deliveries until the advance, plus 8% interest, was repaid. Consistent with this agreement, Davisco made deductions of approximately $8,700 each month from payments made to Azevedo from January 1, 2011 through December 22, 2011. . . .

*Id.* at 593–94 (internal citations omitted). Azevedo continued to supply milk to Davisco and Davisco continued to make deductions to satisfy the advance balance. *Id.* at 594.

MEMORANDUM OF DECISION − 40

Thus, one agreement between the parties governed a series of transactions related to the monthly cash deductions.

Eventually, Azevedo filed for chapter 12 relief. *Id.* at 594. During the pendency of the chapter 12 case, Azevedo continued to deliver milk to Davisco, and Davisco continued to make deduction from Azevedo's milks checks. *Id.* The case was eventually converted from a chapter 12 to a chapter 7. *Id.* The chapter 7 trustee sought to avoid the amount Davisco deducted from Azevedo's milk payments during the pendency of the chapter 12 case as unauthorized, post-petition transfers pursuant to §§ 549 and 550. Davisco asserted the equitable defense of recoupment. *Id.*

Judge Pappas held that the defense of recoupment was available to Davisco because the deductions were in fact part of a "single transaction" for the purposes of applying the recoupment doctrine:

> Measuring the undisputed facts against the "logical relationship test," the Court concludes that Davisco's deductions were indeed part of a "single transaction" for purposes of applying the doctrine of recoupment. [I]n December 2010, Davisco and Azevedo entered into the Patron Advance Disbursement, under which, contrary to the usual terms for Davisco's purchases of milk, Davisco paid Azevedo $100,000 immediately for milk delivered in that same month. Instead of deducting the amount advanced from Azevedo's January 2011 milk checks, though, Davisco agreed to spread out the payments to recover the advance over the course of the following year, thereby allowing Azevedo an immediate influx of cash, and a larger stream of money each month thereafter to cover its operating expenses.

*Id.* at 599. The Court concluded that this type of agreement was one that involved a "netting out of debts arising from a single transaction." *Id.* The single transaction was the December 2010 agreement, which created the basis for the trustee's claims as well as the

MEMORANDUM OF DECISION − 41

recoupment claims by Davisco. *Id.* The Idaho Bankruptcy Court held that there was a

logical relationship between each party's claim by way of the single agreement, and, thus,

"it [was] appropriate to apply the doctrine of recoupment [] because the facts

demonstrated a series of 'ongoing transactions and obligations' created under a single

agreement, the Patron Advance Disbursement contract." *Id.* (citing *Aetna U.S.*

*Healthcare v. Madigan (In re Madigan)*, 270 B.R. 749, 755 (9th Cir. BAP 2001); and *In*

*re B & L Oil Co.*, 782 F.2d 155, 157 (10th Cir. 1986))

Clearly, a single agreement can lead to a series of ongoing transactions and

obligations which could be subject to the doctrine of recoupment. Unlike in *Azevedo*,

where Judge Pappas found that a single agreement led to a series of ongoing transactions

and obligations between the parties, the evidence before the Court indicates no such

agreement existed, aside from Trustee's belief that it would be hard to imagine that one

did not exist. There is no evidence of a single agreement between the parties that led to

their years' long business relationship, or that every transaction that occurred between the

parties during that time arose out of any single agreement whatsoever. This is clearly

distinguishable from *Azevedo*, where there was one purchase agreement that led to the

series of payments, deductions, and deliveries between the parties.

The next applicable case is *California Canners and Growers v. Military Distribs.*

*of Virginia (In re California Canners and Growers)*, 62 B.R. 18 (9th Cir. BAP 1986)

where the Ninth Circuit BAP affirmed a bankruptcy court's decision refusing to apply the

doctrine of recoupment. In that case, the relationship between the parties was established

MEMORANDUM OF DECISION − 42

by a distributorship agreement between the parties. *Id.* The parties had several pre- and post-petition debts for "several single transactions" that the defendant attempted to recoup. *Id.* However, the Ninth Circuit BAP found that the distributorship agreement did not constitute a "single transaction" between the parties, such that every transaction thereafter could be considered part of a single transaction for the purposes of applying recoupment. *Id.* The BAP held that the distributorship agreement was only in place to govern the overarching relationship between the parties, and that distributorship agreement contemplated that the parties might enter into transactions for the sale and purchase of goods. *California Canners and Growers v. Military Distribs. of Virginia (In re California Canners and Growers)*, 62 B.R. at 20. The BAP found the eventual dealings between the parties to be "separate and distinct transactions." *Id.*

This case is more akin to *California Canners and Growers v. Military Distribs. of Virginia (In re California Canners and Growers)* than it is to *Azevedo*. At best, the agreement as contemplated by the Trustee between HHG and All Terrain, if any existed, is similar to the "distributorship agreement" between the parties in *California Canners and Growers v. Military Distribs. of Virginia (In re California Canners and Growers)*. In that case, the agreement contemplated the overarching relationship between the parties, but all future dealings stood on their own as single transactions in and of themselves. Here, even assuming the parties had an agreement to conduct ongoing business, there was no agreement that governed every transaction that occurred. Each dealing between the parties was a separate and distinct transaction, just as they were for the parties in

MEMORANDUM OF DECISION − 43

*California Canners and Growers v. Military Distribs. of Virginia (In re California Canners and Growers)*.

This Court finds that All Terrain is not entitled to recoupment because there was no agreement based on a single transaction between the parties. Aside from briefly restating the doctrine of recoupment, Trustee points the Court to no single transaction between the parties that led to HHG's claim against All Terrain. Indeed, the parties conducted extensive business together over the course of several years. Trustee posits that "[i]t is difficult to imagine that the two entities would have continued such a relationship without either an express or implied agreement that the Debtor would be compensated for the services it provided to HHG." Dkt. No. 345, p. 14. Perhaps, but this is not the proper threshold for recoupment to apply. It appears that Trustee believes All Terrain is entitled to recoupment simply because of the ongoing business relationship between the parties. The existence of such a relationship alone, however, does not entitle All Terrain to an all-encompassing right to recoupment. The doctrine of recoupment requires All Terrain's claim against HHG to arise out of the same claim as HHG's claim against All Terrain. Here, HHG's claim is the avoidance of transfers made by HHG to All Terrain that All Terrain used for gambling. All Terrain's claims to recoupment against HHG do not arise from those same transfers, and there is no logical relationship between the transfers here and the overall business relationship between the parties, nor is there any single agreement governing all transactions between the parties. Accordingly, All Terrain is not entitled to any reduction of HHG's claim under the doctrine of recoupment.

MEMORANDUM OF DECISION − 44

*Conclusion*

Trustee's Objection to Claim Number 7 will be sustained in part and overruled in part. Claim Number 7 will be allowed to the extent of $4,111.36 related to avoidance of post-petition transfers. Claim Number 7 will also be allowed to the extent of $79,136.65 for avoidable pre-petition transfers pursuant to § 548(a)(1)(B). Rainsdon has not established a claim for any pre-petition transfers pursuant to § 544(b)(1). In total, Claim No. 7 will be allowed in the sum of $83,248.01. The balance of claim No. 7 is disallowed.

A separate order consistent with this Decision will be entered.

DATED:  December 7, 2020

_____
JOSEPH M. MEIER
CHIEF U. S. BANKRUPTCY JUDGE